**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CRISPINIANA DOMINGO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-02566 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THE PRUDENTIAL INSURANCE | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Crispiniana Domingo, a nurse at a local hospital, suffered a disability after a coworker falsely accused her of abusing a patient. She was charged and acquitted. She later submitted a disability claim under a policy that her employer had purchased from Defendant Prudential Insurance Company of America. Prudential ultimately rejected the claim, concluding that the disability first emerged after the policy had expired.

Domingo filed a complaint in state court, seeking monthly benefits under the policy plus statutory damages and attorneys' fees. Prudential, in turn, removed the case to federal court on the basis of diversity jurisdiction. The parties are, in fact, diverse, and Prudential alleged that the amount in controversy exceeded $75,000. Prudential pointed to the fact that Domingo was seeking more than $6,000 in monthly benefits alone.

Domingo originally agreed that this case satisfied the amount-in-controversy requirement. But months later, Domingo changed her tune. She points to caps that the policy places on recoverable benefits. Based on those caps, Domingo argues that it was legally impossible for her to recover more than $75,000 – measured on the day of removal – even if one

includes statutory damages and attorneys' fees. The caps placed a hard ceiling on the amount of recoverable benefits, and it was a legal certainty that she could not recover more.

Domingo filed a motion to remand. The motion is granted.

## Background

In 2000, Plaintiff Crispiniana Domingo began working as a registered nurse at the UIC Medical Center. *See* Third Am. Cplt. ¶¶ 1, 30 (Dckt. No. 53).[1] Nurses have active, on-the-go jobs. The position of registered nurse is classified as a medium exertion level occupation. *Id.* at ¶ 30. To do her job, Domingo needed to lift and carry 30 pounds, and perform tasks that required standing, squatting, bending, and crouching. *Id.*

Her life unraveled on May 16, 2016. *Id.* at ¶ 31. Domingo was arrested at work for allegedly assaulting a patient, based on an accusation made by her secretary. *Id.* at ¶¶ 31, 33. The complaint alleges that the "University of Illinois" arrested her. *Id.* at ¶ 31. Maybe Domingo means that she was arrested by campus security. But in any event, her work life was turned upside down, and her health spiraled downward.

The University opened an investigation and instructed Domingo to stay away from the hospital. *Id.* at ¶¶ 31–32. In the meantime, the University placed her on administrative leave beginning on May 19, 2016. *Id.* at ¶ 31. She continued to receive pay. *Id.*

---

[1] The existence of federal jurisdiction depends on the state of affairs when a party invokes it. *See* 14AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3702.1 (4th ed. 2020). Here, Prudential removed this case on April 16, 2019, and Domingo then filed a series of amended complaints, including a third amended complaint on December 6, 2019. *See* Third Am. Cplt. (Dckt. No. 53). The Background section of this Opinion relies on facts stated in the third amended complaint because they contain more details, and thus bring the underlying dispute into sharper focus. For example, it contains more information about Domingo's disability and leave of absence. The additional facts tell a better story and lead to a better understanding of the dispute. Still, the citations to a later-filed amended complaint do not change the fact that federal jurisdiction needed to exist at the time of removal. The question is whether there was jurisdiction on April 16, 2019, when the case arrived in federal court.

The police apparently got involved at some point (the complaint does not say when). She spent six nights in the Cook County Jail in July 2016, before the Philippine Nurse Association of Illinois posted bail on her behalf. *Id.* at ¶ 35.

The accusation, arrest, investigation, and incarceration deeply affected Domingo. *Id.* at ¶¶ 33–34. She experienced "trauma, depression and anxiety, which led to post-traumatic stress disorder and a suicide attempt and repeated suicidal ideation." *Id.* at ¶ 33. During her incarceration, Domingo "attempted suicide by trying to hang herself with bed sheets." *Id.* at ¶¶ 34–35. She planned to commit suicide after her release. *Id.* at ¶ 36.

After her release in mid-July 2016, Domingo admitted herself for inpatient treatment at another hospital. *Id.* at ¶ 37. She was sleeping less than 4 hours a night, and sleeping on the floor with feelings of helplessness. *Id.* She experienced constant crying, and gained 10 pounds in the first month. *Id.* at ¶ 38. She attributes the physical and mental anguish to the ordeal from the accusation of abuse – she claims that she was disabled since the day of her arrest in May 2016. *Id.* at ¶¶ 38–40.

During her administrative leave, Domingo began suffering from other serious physical problems, too. She felt significant pain in her neck, shoulders, and back. *Id.* at ¶ 40. In May 2017, she was diagnosed with neck pain, chronic bilateral shoulder pain, chronic back pain, and cervical radiculopathy (*i.e.,* a "pinched nerve"). *Id.* at ¶ 41. She received a variety of treatments, including chiropractic care. *Id.* at ¶ 42.

The chiropractic care apparently set her back. In September 2017, Domingo was diagnosed with "Vertebral Artery Dissection with a 2mm dissecting aneurysm," meaning a tear in one of the four arteries involved in blood flow to the brain. *Id.* at ¶¶ 43–44. The dissection causes blood to enter the arterial wall and form clots, creating a risk of stroke and causing

3

headaches. *Id.* at ¶ 44. The likely cause was "chiropractic manipulation, one of the forms of treatment she received for her disabling neck pain." *Id.* at ¶ 43.

Domingo received more bad news about her health in January 2018. Scans revealed a 3mm aneurysm in the brain. *Id.* at ¶ 45. Other tests in the spring of 2018 revealed two more aneurysms. *Id.* at ¶ 52.

In the first quarter of 2018, Domingo went to trial on the abuse charges and was acquitted. *Id.* at ¶ 46. Video surveillance proved the charges wrong. *Id.* at ¶¶ 1, 46. According to the complaint, Domingo's secretary made up the whole thing as revenge for a bad performance review. *Id.* at ¶ 31. The University fired the secretary and other staff involved in the accusation and arrest. *Id.* at ¶ 46.

After the acquittal, the University told Domingo that it had completed its investigation and allowed her to return to work. *Id.* But by then, Domingo "was already disabled." *Id.* at ¶ 47. She used sick leave from March until September 18, 2018, when it ran out. *Id.* at ¶ 49.

In May 2018, while she was using sick leave, Domingo applied for disability benefits from two sources. *Id.* at ¶¶ 47–48. She applied under the State University Retirement System ("SURS"), a state agency that administers retirement, disability, and other benefits for employees in public higher education in Illinois. *Id.* at ¶ 48. She also applied under a long-term disability insurance policy that the University of Illinois purchased from Prudential, the Defendant. *Id.* at ¶¶ 6, 48. Domingo was a covered insured under the Prudential policy. *Id.* at ¶ 25.

SURS ultimately approved her claim for benefits, with a disability date of May 16, 2016 (*i.e.*, her last day of work). *Id.* at ¶¶ 11, 92. SURS awarded her a disability benefit of $6,510.63 per month, representing 50% of her average earnings for the 24 months before she became disabled (that is, half of $13,021.26 per month). *Id.* at ¶¶ 13, 97–98.

But Prudential denied coverage. The policy covered employees who suffer a disability during a "leave of absence" for one year. *Id.* at ¶ 58. "If you are on a ***leave of absence***, and if premium is paid, you will be covered to the end of 12 months following the month in which your leave of absence begins." *Id.* (emphasis in original); *see also* Group LTD Policy No. DG-9263G-IL, at 6 (Dckt. No. 53-2, at 8 of 47). Domingo's involuntary leave began in May 2016, and the following month was June 2016. *Id.* at ¶ 31. So, if this provision applied to Domingo, coverage would exist for any disability suffered through June 30, 2017 (that is, the end of the 12-month period that began on June 30, 2016, the month after she left her job in May 2016).

Prudential decided that Domingo suffered the alleged disability after coverage ended on June 30, 2017. *Id.* at ¶¶ 61, 70. Prudential explained its decision as follows: "[T]he latest date that you would be eligible for coverage would be June 30, 2017. The medical information in file notes that your symptoms began as of September 01, 2017." *See* 5-18-18 Letter, at 2 (Dckt. No. 53-3). After summarizing the medical treatment that Domingo received after coverage ended, Prudential explained that the disability was out of date, so Domingo was out of luck. "[Y]our LTD coverage if you were on a leave of absence as defined in the policy, would have ended after June 30, 2017. Your reported date of disability is over nine months after your coverage would have ended, as a result, we are unable to approve your claim for LTD benefits as your coverage ended prior to your reported date of disability."[2] *Id.*

_____

[2] In addition to the timing of the disability, another important issue was whether Domingo's involuntary leave was a "leave of absence" within the meaning of the policy. *See* Third Am. Cplt. ¶¶ 61, 70. When denying the appeal, Prudential concluded that her leave was a leave of absence. *See* 2-14-19 Letter, at 4 (Dckt. No. 53-10, at 6 of 19) ("While Ms. Domingo may have been employed, she was not actively employed. Thus, Ms. Domingo's leave effective May, 2016 is considered a leave of absence, as defined by the plan, with coverage ending after June 30, 2017."); *id.* at 12 (Dckt. No. 53-10, at 14 of 19) ("Thus, Ms. Domingo was effectively on a leave of absence, as defined by the Group Policy, as of the date her employer imposed such in May of 2016.").

Domingo appealed the denial of coverage, but Prudential rejected the claim yet again. *Id.* at ¶¶ 70–87. The complaint before this Court attempts to poke a bunch of holes in the appeal. The punchline is that Prudential allegedly did not receive or review various medical records. *Id.*; *see also id.* at ¶ 89 ("Prudential never evaluated three of the four sets of records submitted by Domingo with her appeal."). Domingo faults Prudential for failing to review a functional capacity evaluation, chiropractic records, and psychiatric treatment records. *Id.* at ¶¶ 90, 93, 95.

In April 2019, Domingo ultimately filed a three-count complaint against Prudential in the Circuit Court of Cook County. *Id.* at ¶ 17. Count I sought a declaratory judgment that the policy covered her disability claim.[3] *See* Cplt., at ¶¶ 44–47 (Dckt. No. 4). Count II alleged a breach of contract and demanded damages of $6,020.45 per month (that is, 66.67% of her salary, as provided in the policy).[4] *Id.* at ¶ 52. Count III sought statutory damages and attorneys' fees under the Illinois Insurance Code for a vexatious and unreasonable denial of coverage. *Id.* at ¶¶ 54–57.

---

[3] Domingo requested a declaratory judgment that she was "*not* on a leave of absence as that term is defined in the policy." *See* Cplt., at ¶ 47 (emphasis added) (Dckt. No. 4); *see also id.* at ¶ 32 (alleging that Domingo appealed and demonstrated why the "paid, involuntary administrative leave was *not* a leave of absence as defined in the policy") (emphasis added). Domingo's theory of the case is not entirely clear. Maybe Domingo was arguing that the involuntary leave was not a "leave of absence" and thus the one-year limit didn't apply (that is, there was no time limit because she was never on leave). In other parts of the third amended complaint, it appears that Domingo is arguing the opposite – that is, that involuntary leave *was* a "leave of absence" and thus that Domingo can take advantage of coverage under that provision. In the end, Domingo's theory on the merits does not matter much to this motion.

[4] The math does not seem to be consistent across the various complaints. The state court complaint alleged that $6,020.45 per month was "66.67% of her salary." *See* Cplt., at ¶ 52 (Dckt. No. 4). That suggests that her salary was $108,368.10 (that is, $6,020.45 times 3/2, times twelve months). But the third amended complaint alleged that $6,510.63 was "50% of her average earnings for the 24 months prior to the date she became disabled or $13,021.26." *See* Third Am. Cplt., at ¶ 13 (Dckt. No. 53). That suggests that her salary was $156,255.12 (that is, $13,021.26 times twelve months). Maybe her salary changed during the 24-month period. The SURS Certificate states that her average monthly earnings during the 24 months preceding disability was $13,021.25, and that her monthly earnings on the date of disability was $8,592.48. *See* SURS Certification of Disability Benefits, at 1 (Dckt. No. 53-11, at 2 of 2).

Prudential promptly removed the case to federal court. The state court complaint did not specify when, exactly, coverage allegedly began for the disability. The starting point was a bit up in the air. Prudential read the complaint to seek disability coverage starting in March 2018 (that is, when Domingo was allowed to return to work). *See* Notice of Removal, at ¶ 13 (Dckt. No. 1) (citing Cplt., at ¶ 29).

There were 13 months between March 2018 (the alleged start date for disability coverage) and April 2019 (when Prudential removed the case to federal court). Multiplying the number of months (13) by the amount of monthly coverage ($6,025.45) yielded $78,265.85, more than the $75,000 threshold for diversity jurisdiction. According to Prudential, the case satisfied the amount-in-controversy requirement even before considering attorneys' fees and statutory damages. *See* Notice of Removal, at ¶ 16 (Dckt. No. 1).

At first, Domingo embraced federal jurisdiction. Both the first amended complaint and the second amended complaint alleged that the amount in controversy exceeded $75,000. *See* Am. Cplt., at ¶ 5 (Dckt. No. 13); Second Am. Cplt., at ¶ 5 (Dckt. No. 24). In their Joint Initial Status Report, the parties agreed that the case satisfied the amount-in-controversy requirement. *See* Joint Initial Status Report, at 1 (Dckt. No. 19).

The parties expressed the same agreement in another status report a few months later. The parties even pinned down precise numbers. "Though the parties disagree on the amount of damages, plaintiff's second amended complaint contends damages include past-due benefits of approximately $77,692.46, statutory damages in the amount of $46,615.48, and attorneys' fees in the amount of $28,882.00 up to the filing of the complaint." *See* Initial Status Report for Reassigned Case, at 2 (Dckt. No. 32).

But Domingo later changed course. At a hearing, Domingo informed the Court that she no longer believed that this case satisfied the amount-in-controversy requirement on the day of removal. *See* 11/1/19 Tr. (Dckt. No. 51); *see also* 11/1/19 Order (Dckt. No. 42). Domingo soon filed a motion to remand. *See* Mtn. to Remand (Dckt. No. 47).

The gist of the motion to remand is that the Prudential policy entitles Domingo to less money than she originally thought, for two reasons. First, the policy covered a shorter period than Domingo initially believed. Coverage could begin, at the earliest, when Domingo stopped receiving sick pay. So Domingo could not receive benefits from March to September 2018 after all. Second, the monthly payments were lower, too. The original complaint did not take into account that Domingo received disability payments from SURS. The Prudential policy requires Domingo to subtract that amount (so that there is no disability benefit double-dipping).

Domingo now claims that she is entitled to *lower* payments for *fewer* months. The true amount that is recoverable under the policy, she argues, is a little more than $15,000 (before statutory damages and attorneys' fees). *See* Mtn. to Remand, at 6–7 (Dckt. No. 48). The reduction in the amount of damages has a significant impact on the amount of recoverable statutory damages, too. Domingo now believes that she can recover, at best, less than $10,000 in statutory damages. *Id.* at 8. Attorneys' fees top out at $28,882 (or perhaps $25,000). *Id.* at 10.

Adding it all together, Domingo argues that the amount in controversy was below the $75,000 threshold for diversity jurisdiction when it arrived in federal court. Domingo ultimately filed a third amended complaint, taking the position that this Court lacks subject matter jurisdiction. *See* Third Am. Cplt. (Dckt. No. 53). Domingo alleges that she seeks only $13,021.22 for disability benefits, $7,812.73 in statutory damages, and $25,000 in attorneys' fees. *Id.* at ¶¶ 18, 20, 21.

Defendants typically welcome the news that a plaintiff is seeking a lower amount of damages. But Prudential opposed the motion to remand, arguing that Domingo is trying to engineer an escape to state court by making after-the-fact changes to her demand for relief.

### Legal Standard

Federal courts are courts of limited jurisdiction. *Harrington v. Berryhill*, 906 F.3d 561, 566 (7th Cir. 2018). "They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Id.* (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

District courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000," and is between citizens of different States.[5] *See* 28 U.S.C. § 1332(a). The measuring point is the day when a party invokes federal jurisdiction. So, in removal cases, the relevant time is the amount in controversy on the day of removal. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 510–11 (7th Cir. 2006); 14AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3702.4 (4th ed. 2020).

The burden is on the party who brought the case to the federal courthouse, either by filing the case in the first place (as the plaintiff) or by removal (as the defendant). *See Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 541 (7th Cir. 2006); *see also Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447 (7th Cir. 2005) ("Whichever side chooses federal court must establish jurisdiction; it is not enough to file a pleading and leave it to the court or the adverse party to negate jurisdiction."). In removal cases, the defendant "must establish what the plaintiff stands to recover." *Meridian Sec. Ins.*, 441 F.3d at 541.

---

[5] There is no dispute here that the parties are citizens of different states. Prudential is a citizen of New Jersey, and Domingo is a citizen of Illinois. *See* Def.'s Opp. to Mtn. to Remand, at 7 n.2 (Dckt. No. 62).

Sometimes the allegations of a complaint are sufficient to satisfy the amount-in-controversy requirement.  "As a practical matter, in the removal context, if the sum claimed by the plaintiff in the state court complaint exceeds the jurisdictional amount at the time that removal is perfected, it is well-established that the defendant's burden is rather light because, as the Supreme Court has indicated, 'there is a strong presumption that the plaintiff has not claimed a large amount in order to confer jurisdiction on a federal court or that the parties have colluded to that end.'"  *See* 14AA Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3702.2 (4th ed. 2020) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 290 (1938)).

But sometimes the amount in controversy does not jump off the pages of the complaint. In that scenario, a removing defendant must show by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional threshold.  *See Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 579 (7th Cir. 2017).  The question is the amount that the plaintiff is seeking when the case arrives in federal court, not the amount that the plaintiff is likely to recover.  *See Rising-Moore v. Red Roof Inns, Inc.*, 435 F.3d 813, 816 (7th Cir. 2006).  Federal jurisdiction does not depend on a prediction of the likely outcome of the case.  *See Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 829–30 (7th Cir. 2011); *Meridian Sec. Ins.*, 441 F.3d at 543.

Defendants often face difficulty when "plaintiffs, who control the allegations of the complaint, do not want to be in federal court and provide little information about the value of their claims."  *Blomberg v. Serv. Corp. Int'l*, 639 F.3d 761, 763 (7th Cir. 2011).  A defendant may "present its own estimate of the stakes; it is not bound by the plaintiff's estimate."  *Back Doctors*, 637 F.3d at 830.  "In many removal cases, a defendant's allegations rely to some extent

on reasonable estimates, inferences, and deductions." *Abraham v. State Farm Mut. Auto. Ins. Co.*, 2020 WL 1433782, at *5 (N.D. Ill. 2020).

A notice of removal "need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014); *see also Roppo*, 869 F.3d at 579 ("A removing party therefore only must establish the amount in controversy by a good faith estimate that is 'plausible and adequately supported by the evidence.'") (quoting *Blomberg*, 639 F.3d at 763); 28 U.S.C. § 1446(a) (requiring only a "short and plain statement of the grounds for removal"). This burden "is a pleading requirement, not a demand for proof." *Spivey v. Vertrue, Inc.*, 528 F.3d 982, 986 (7th Cir. 2008).

"When a defendant removes to federal court . . . its plausible and good faith estimate of the amount in controversy establishes jurisdiction unless it is a 'legal certainty' that the plaintiffs' claim is for less than the requisite amount." *Webb v. Fin. Indus. Regulatory Auth., Inc.*, 889 F.3d 853, 859 (7th Cir. 2018); *see also Carroll v. Stryker Corp.*, 658 F.3d 675, 680 (7th Cir. 2011) ("[J]urisdiction will be defeated only if it appears to a legal certainty that the stakes of the lawsuit do not exceed $75,000."); *Spivey*, 528 F.3d at 986; *St. Paul Mercury Indem.*, 303 U.S. at 288–89 ("The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."). Simply put, "unless recovery of an amount exceeding the jurisdictional minimum is legally impossible, the case belongs in federal court." *Back Doctors*, 637 F.3d at 830.

Federal jurisdiction cannot rest on impossibilities. "A demand is legally impossible for jurisdictional purposes when it runs up against a statutory or contractual cap on damages or when the theories of damages employ double counting." *Johnson v. Wattenbarger*, 361 F.3d 991, 994 (7th Cir. 2004) (citation omitted). "Sometimes a clause is so clear, or the legal means of undermining it so weak, that the plaintiff's demand is bound to come under the cap, and *St. Paul* would be satisfied at the inception of the case." *Pratt Central Park Ltd. Partnership v. Dames & Moore, Inc.*, 60 F.3d 350, 353 (7th Cir. 1995). Legally impossible amounts don't count.

A plaintiff cannot defeat jurisdiction by changing its mind about the amount of damages that it is seeking. A district court does not lose jurisdiction when "the plaintiff after removal, by stipulation, by affidavit, or by amendment of his pleadings, reduces the claim below the requisite amount . . . ." *St. Paul Mercury Indem.*, 303 U.S. at 292; *see also Chase v. Shop 'N Save Warehouse Foods, Inc.*, 110 F.3d 424, 429 (7th Cir. 1997). A "post-removal stipulation to the amount in controversy cannot defeat removal because jurisdiction is determined on the day the case is removed." *MRT, LLC v. Select Mgmt. Resources, LLC*, 2017 WL 2985603, at *1 (S.D. Ill. 2017); *Johnson*, 361 F.3d at 993 ("[E]vents after the suit begins do not affect the diversity jurisdiction.").

But the Court can consider facts that shed light on the damages that were recoverable on the day of removal. "Events subsequent to removal that merely reveal whether the required amount was in dispute on the date of filing, rather than alter the current amount in controversy, can be considered in deciding what that original amount in controversy was." *BEM I, LLC v. Anthropologie, Inc.*, 301 F.3d 548, 552 (7th Cir. 2002). That is, "events subsequent to removal may clarify what the plaintiff was actually seeking when the case was removed." *Carroll*, 658 F.3d at 681; 14AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*

12

§ 3702.4 (4th ed. 2020) ("Courts have distinguished between subsequent events that cannot destroy subject matter jurisdiction, and subsequent events that require the dismissal or remand of the case because they reveal that the necessary dollar amount either was or was not actually in controversy at the commencement of the action in federal court or when it was removed from state court.").

Sometimes new information will show that there was no federal jurisdiction on day one. If "after the case is filed it is discovered that there was no jurisdiction at the outset," then the court must dismiss the case because jurisdiction was never really there. *See Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 807 (7th Cir. 2010). A court must remand "if jurisdiction never existed in the first place." *Carroll*, 658 F.3d at 681.

In sum, the "estimate of the dispute's stakes advanced by the proponent of federal jurisdiction controls unless a recovery that large is legally impossible." *Back Doctors*, 637 F.3d at 830. Here, the question is whether it was legally impossible for Domingo to recover more than $75,000 on the day of removal.

### Discussion

I.   **The Amount in Controversy**

Domingo demanded three forms of monetary relief in her complaint: monthly benefits under the policy, statutory damages, and attorneys' fees. The Court will address each in turn.

A.    **Disability Benefits under the Policy**

The most significant piece of the puzzle is the amount of disability benefits that Prudential arguably owed Domingo under the policy.

In her state court complaint, Domingo demanded disability benefits totaling "66.67% of her salary, or $6,020.45 a month." *See* Cplt., at ¶ 52 (Dckt. No. 4, at 9 of 14). The complaint

was less specific about when, in Domingo's view, the benefits started to accrue. She alleged that she was "already disabled and requested disability leave" in "March 2018." *Id.* at ¶ 29. Under a fair reading of the complaint, Domingo demanded disability benefits beginning in March 2018.

Prudential rested its notice of removal on simple arithmetic. Domingo demanded $6,020.45 a month, and seemingly demanded benefits from March 2018 (when she requested benefits) until April 2019 (when Prudential removed the case). Multiplying them together, Prudential calculated that Domingo was seeking at least $78,265.85 (that is, $6,020.45 a month, times 13 months). *See* Notice of Removal, at ¶ 15 (Dckt. No. 1). So, in Prudential's view, the case satisfied the amount-in-controversy requirement, even before considering attorneys' fees and statutory damages.

Domingo now argues that she was wrong from the get-go. *See* Mtn. to Remand, at 7–8 (Dckt. No. 48). In her view, the policy did not allow her to start receiving payments until her sick pay ended in September 2018. And she needed to deduct the payments received from SURS, too. So Domingo argues that she was entitled to receive, at most, a lower payment for fewer months.

### 1.    The Number of Months

Based on the plain language of the policy, Domingo had a claim for only seven months (not thirteen months) of coverage when this case arrived in the federal courthouse.

The policy includes a section entitled "How Long Must You Be Disabled Before Your Benefits Begin?" *See* Group LTD Policy No. DG-9263G-IL, at 11 (Dckt. No. 53-2, at 13 of 47). The key point is the so-called "elimination period." "Benefits start after the elimination period." *Id.* at 1 (Dckt. No. 53-2, at 3 of 47); *see also id.* ("**Benefits begin the day after the Elimination Period is completed.**") (emphasis in original).

14

Benefits do not begin until the insured has finished the "elimination period," meaning a "period of continuous disability which must be satisfied before you are eligible to receive benefits from Prudential." *Id.* at 11 (Dckt. No. 53-2, at 13 of 47). The elimination period is 90 days, or the exhaustion of sick leave, whichever is greater. *Id.* ("Your elimination period is the greater of 90 days or exhaustion of accumulated sick leave.").

The phrase "90 days" raises a question – 90 days from what? Maybe it means 90 days from when the employee became disabled (that is, 90 days of a "continuous disability"). If Domingo became disabled in May 2016 (when she was arrested), then the 90-day period would end in August 2016. Or maybe it means 90 days from when the employee applied for coverage. Domingo applied for coverage in May 2018, so the 90-day period would end in August 2018.

But that side of the equation isn't critical. Domingo did not exhaust her sick pay until September 18, 2018. *See* SURS Certification of Disability Benefits, at 1 (Dckt. No. 53-11, at 2 of 2) ("Date Salary Payments Ceased: 09/18/2018"); *see also* Domingo Aff., at ¶ 5 (Dckt. No. 48-4) ("I exhausted my accumulated sick leave on September 18, 2018."). The other two possible dates (May 2016 and May 2018) are irrelevant, because September 18, 2018 came later, and the later date is what matters under the policy. Domingo received sick pay through September 18, 2018, so the "elimination period" ended on that day, too. Coverage could not begin until September 19, 2018, the day after.

Under the policy, Domingo had no right to coverage before September 19, 2018. At best, Domingo had a right to coverage from September 19, 2018 (the day after sick pay ended) until April 16, 2019 (when Prudential removed this case to federal court). That's seven months of coverage, tops.

Prudential does not advance much of a response. Prudential argues that a "dispute over contractual language . . . cannot impact the amount in controversy at the time of removal." *See* Opp. to Mtn. to Remand, at 10 (Dckt. No. 62). Not so. The Court can consider the contract if it shows that recovery of more than $X is impossible. *See Johnson*, 361 F.3d at 994; *Carroll*, 658 F.3d at 681 (noting that "statutory or contractual cap[s] on damages" are "common examples of claims that are considered 'legally impossible' for jurisdictional purposes"). A "court has the *power* to dismiss for want of jurisdiction after deciding that a limitation-of-liability clause (or a state statute) caps damages at less than the jurisdictional amount." *Pratt Central Park*, 60 F.3d at 353 (emphasis in original).

Prudential does not respond to a simple point: it is a legal certainty that Domingo could not recover disability benefits before September 2018. So anything before September 2018 can't count when adding up the amount in controversy.

Prudential seems to think that Domingo is stuck with her original complaint. *See* Opp. to Mtn. to Remand, at 10 (Dckt. No. 62). That's not the case. If the complaint includes a demand for damages that are not legally recoverable, then those damages do not count toward the amount in controversy. *See Rising-Moore*, 435 F.3d at 816 ("The burden, rather, is to show what the plaintiff hopes to get out of the litigation; if this exceeds the jurisdictional amount, then the case proceeds in federal court unless a rule of law will keep the award under the threshold."). Non-recoverable damages are not "in controversy" within the meaning of Article III.

Parties cannot stipulate to subject matter jurisdiction. *United States v. County of Cook*, 167 F.3d 381, 387 (7th Cir. 1999). By the same token, a party cannot create subject matter jurisdiction by demanding damages that are impossible to recover. Federal jurisdiction does not exist simply because a party says so. "The district court is not obliged to accept the plaintiff's

16

allegations regarding subject matter jurisdiction." 14AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3702.2 (4th ed. 2020). At best, the complaint may create a presumption, but it is not dispositive. *Id.*

Prudential seems to fault Domingo for raising this point late in the game. *See* Opp. to Mtn. to Remand, at 2 (Dckt. No. 62). But a court can – and must – consider subject matter jurisdiction at any time. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears the district court lacks subject matter jurisdiction, the case shall be remanded."); Fed. R. Civ. P. 12(h)(3). It is never too late to raise subject matter jurisdiction.

And, not that it matters, but it is hard to believe that Prudential is truly surprised. Insurance companies are well-versed at reading insurance policies to the letter. Surely Prudential was well positioned to figure out when coverage began. And Prudential undoubtedly knew that Domingo could not get benefits when she was receiving sick pay.

In sum, Domingo had a claim for seven months of coverage at the time of removal. The clock started in September 2018 (when coverage began), and stopped in April 2019 (when removal took place). That's seven months. As of the moment of removal, it was legally impossible to recover for a longer period.

## 2. The Amount of the Monthly Payment

The amount of the monthly payment is the other part of the equation. In the state court complaint, Domingo alleged that Prudential owed her $6,020.45 per month, or 66% of her salary. *See* Cplt., at ¶ 52 (Dckt. No. 4). That, too, was overstated. The policy required deductions, and Domingo did not take the deductions into account.

The policy did not guarantee full disability payments to an employee, regardless of other sources of payment. Instead, the policy reduced the amount owed by Prudential if the employee

17

received disability benefits from other sources. The "**Benefit Highlights**" flagged this point on page one of the policy: "Your benefit may be reduced by deductible sources of income and disability earnings." *See* Group LTD Policy No. DG-9263G-IL, at 1 (Dckt. No. 53-2, at 3 of 47) (emphasis in original). That way, an employee would not receive compensation for the same disability twice.

The policy included an explanation about how to calculate the monthly payment for disability benefits, and deductions played a prominent role. The starting point was the gross disability payment. That amount was 66.67% of the employee's monthly income, or $12,000, whichever was less. *Id.* at 11 (Dckt. No. 53-2, at 13 of 47). At that point, Prudential would subtract any "**deductible sources of income**," meaning "income from deductible sources listed in the plan that you receive or are entitled to receive while you are disabled." *Id.* at 11–12 (emphasis in original). The remaining amount was the monthly payment. *Id.* at 12 (Dckt. No. 53-2, at 14 of 47) (defining the monthly payment as the "payment after any deductible sources of income have been subtracted from your gross disability payment"). *Id.*

The policy included a detailed description in a section entitled "**What Are Deductible Sources of Income?**" *Id.* at 14 (Dckt. No. 53-2, at 16 of 47) (emphasis in original). The policy explained that "Prudential will deduct from your gross disability payment the following deductible sources of income." *Id.* The list of deductions expressly included the "amount that you receive or are entitled to receive as loss of time disability income payments under any . . . *State Universities Retirement System* benefit." *Id.* (emphasis added). So payments from SURS qualified as a deduction.

Domingo received monthly disability payments from SURS, and those payments reduced the amount that she could recover from Prudential. Here's the calculation. Domingo's gross

18

disability payment was 66.67% of her monthly earnings, or $12,000, whichever was less. *Id.* at 11 (Dckt. No. 53-2, at 13 of 47). She earned $13,021.26 per month.[6] *See* Third Am. Cplt., at ¶¶ 13, 97 (Dckt. No. 53); SURS Certification of Disability Benefits, at 1 (Dckt. No. 53-11, at 2 of 2) (reflecting a monthly payment of $13,021.25, one penny less). Two-thirds of her monthly income ($13,021.26) was $8,680.83. That amount is less than $12,000, so $8,680.84 was the gross disability payment.

At that point, the deductions applied. Domingo received $6,510.63 per month from SURS, which reduced the amount owed by Prudential. *See* Domingo Aff., at ¶ 8 (Dckt. No. 48-4); Third Am. Cplt., at ¶¶ 13, 98 (Dckt. No. 53). The gross disability payment ($8,680.83) minus the deduction for the monthly payment from SURS ($6,510.63) leaves a total of $2,170.20. *See* Third Am. Cplt., at ¶¶ 10, 16, 99. All told, the most that Domingo could recover from Prudential under the policy was $2,170.20 per month.

Once again, Prudential does not take issue with the deduction on the merits. Tellingly, Prudential never argues that it was possible for Domingo to receive more than $2,170.20 per month.

Instead, Prudential argues that the SURS information arrived after the fact, meaning after Prudential removed the case to federal court. In its view, the content of the state court complaint is what matters, not documents discovered after the case arrived in federal court. *See* Def.'s Opp. to Mtn. to Remand, at 10 (Dckt. No. 62). Prudential basically argues that later-acquired

---

[6] The state court complaint alleged that "Domingo's benefits under the insurance contract are 66.67% of her salary, or $6,020.45 per month." *See* Cplt., at ¶ 52 (Dckt. No. 4). That allegation suggests that her monthly salary was $9,030.67 (because $6,020.45 is two-thirds of $9,030.67). But if the starting point is $6,020.45 instead of $8,680.84 (that is, two-thirds of $13,021.26, which is the figure discussed in the paragraph above), then the starting point would be even lower. The policy required deductions for the payments from SURS, and SURS paid $6,510.63 per month. The math suggests that Domingo would be entitled to nothing, because the starting point ($6,020.45) would be lower than her monthly payment from SURS ($6,510.63).

information cannot defeat removal, because jurisdiction depends on the state of affairs at the moment of removal.

The state court complaint does not control if it demanded damages that are impossible to recover. "The state of things and the originally alleged state of things are not synonymous; demonstration that the original allegations were false will defeat jurisdiction." *See Rockwell Int'l Co. v. United States*, 549 U.S. 457, 473 (2007). What matters is the actual amount in controversy at the moment of removal. An allegation about damages cannot save the day if it is a legal certainty that a plaintiff cannot recover them. *See Cunningham Charter Corp.*, 592 F.3d at 807 ("[I]f after the case is filed it is discovered that there was no jurisdiction at the outset . . . it is a case in which there never was federal jurisdiction.") (citations omitted).

This case does not involve events that took place after removal. Domingo is not asking to go back to state court based on something that happened later. Instead, Domingo is arguing that there never was subject matter jurisdiction in the first place, based on facts that already existed at the moment of removal.[7] It is a legal certainty that the complaint demanded inflated damages from day one. The maximum monthly payment was $2,170.20, not $6,020.45.

### 3. The Total

The final step is simple arithmetic. Domingo had a claim for seven months of disability benefits, at $2,170.20 per month. Multiplied together, Domingo advanced a claim for $15,191.40.

---

[7] Prudential wouldn't carry the day even if the state court complaint was all that mattered. The state court complaint squarely alleged that Domingo received disability payments from SURS. *See* Cplt., at ¶ 40 (Dckt. No. 4) ("The State University Retirement System evaluated Domingo's claim and found her disabled, awarding her a disability pension."). True, the original complaint did not specify the amount, but Prudential knew from day one that Domingo had received payments that lowered the true amount in controversy.

At the moment of removal, it was a legal certainty that Domingo could not recover benefits until she stopped receiving sick leave. And it was a legal certainty that Domingo could not recover the amount that SURS already paid. After shortening the period, and reducing the monthly payment, the true amount in controversy under the policy was whittled down to $15,191.40.

### B.    Statutory Damages

The next piece is statutory damages under the Illinois Insurance Code. *See LM Ins. Corp. v. Spaulding Enters. Inc.*, 533 F.3d 542, 551 (7th Cir. 2008) (confirming that the amount in controversy includes punitive damages when they are recoverable); *see also Kaplan v. Standard Ins. Co.*, 2013 WL 5433463, at *4–6 (N.D. Ill. 2013); 14AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3702.5 (4th ed. 2020) ("[E]xemplary or punitive damages, when they are permitted to be awarded under the governing substantive law for the claim being asserted by the plaintiff, can be included in determining whether the jurisdictional amount in controversy requirement has been met."). But in the end, it does not add much to the tally.

In addition to attorneys' fees, the Illinois Insurance Code allows an insured to recover statutory damages when the insurer's delay in payment is vexatious or unreasonable. *See* 215 ILCS 5/155. But there is a low ceiling. Specifically, the insured can recover "an amount not to exceed any one of the following amounts," namely:

> (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
>
> (b) $60,000;
>
> (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the

21

> amount, if any, which the company offered to pay in
> settlement of the claim prior to the action.

*Id.*

A plaintiff can recover the smallest of the three numbers. The phrase "an amount not to exceed any one of the following amounts" means that a plaintiff can recover the lowest of the three amounts. *See, e.g.*, *Kaplan*, 2013 WL 5433463, at *6 (collecting cases); *Atteberry v. Esurance Ins. Servs.*, Inc., 473 F. Supp. 2d 876, 877 (N.D. Ill. 2007) ("[A]s the statute makes plain, no award in that amount is possible unless the $60,000 ceiling figure is less than 60% of Atteberry's recovery . . . ."); *Rehkemper & Son, Inc. v. Indiana Lumbermens Mut. Ins. Co.*, 2010 WL 547167, at *5 (S.D. Ill. 2010) ("An award under the statute must be limited to the smallest of the three possible amounts."); *Great Lakes Dredge & Dock Co. v. Commercial Union Assurance Co.*, 2000 WL 1898533, at *14–15 (N.D. Ill. 2000) (explaining that limiting the recovery to the least of the three amounts "comports with the understanding expressed by the vast majority of Illinois courts to have addressed § 155's penalty provision"), *rev'd on other grounds sub nom. Great Lakes Dredge & Dock Co. v. City of Chicago*, 260 F.3d 789, 790 (7th Cir. 2001). The key word in the statutory text is "any." "In reality, § 155 precludes the penalty from exceeding 'any one' of the three options – meaning, quite plainly, that it may not exceed any of the three options." *Great Lakes Dredge*, 2000 WL 1898533, at *14.

For Domingo, the three amounts are as follows. The first amount is 60% of "the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs." *See* 215 ILCS 5/155. Attorneys' fees don't count. The text excludes "all costs," and the beginning of the sentence refers to "attorney fees" and "*other* costs." *Id.* (emphasis added); *see also Kaplan*, 2013 WL 5433463, at *6 (calculating the amount that a party is entitled to recover under the statute, without including attorneys' fees). As explained above, Domingo is

22

entitled to recover disability benefits totaling $15,191.40, at most (that is, seven months of disability benefits, at $2,170.20 per month). Sixty percent of $15,191.40 is $9,114.84.

The second amount is a flat number: $60,000. *See* 215 ILCS 5/155.

The third amount is the difference between the recoverable amount ($15,191.40) and the amount that the insurer offered to pay in settlement. *Id.* The parties don't reveal any details about their settlement negotiations. But suppose the insurer offered nothing. In that case, the difference between the recoverable amount ($15,191.40) and the settlement offer ($0) would be $15,191.40.

Viewed as a whole, the lowest of the three amounts is $9,114.84. So Domingo cannot recover more than $9,114.84 in statutory damages under the Illinois Insurance Code.

Prudential musters no opposition. In fact, Prudential barely mentions the statute at all. Prudential simply notes that the statute allows an insured to recover "the lesser of up to $60,000 or 60% of compensatory damages, including attorney fees."[8] *See* Opp. to Mtn. to Remand, at 3 (Dckt. No. 62); *see also id.* at 8. Prudential does not respond to Domingo's argument that the maximum recovery under the statute was $9,114.84. *See* Mtn. to Remand, at 7–8 (Dckt. No. 48).

## C.    Attorneys' Fees

Domingo also demanded attorneys' fees, which increased the amount in controversy by $28,882.

Legal fees count toward amount in controversy if the plaintiff has a right to them based on a "contract, statute, or other legal authority." *Webb v. Fin. Indus. Regulatory Auth., Inc.*, 889

---

[8] It is unclear if Prudential's use of the phrase "including attorney fees" was some type of argument that attorneys' fees count when calculating the latter amount, meaning the amount of recoverable damages before applying the 60% amount. If so, the three-word-long argument is cursory, and thus is waived. *See Lee v. Chicago Youth Centers*, 69 F. Supp. 3d 885, 889 (N.D. Ill. 2014) (noting that "Seventh Circuit precedent . . . consistently holds that undeveloped, unsupported, perfunctory, or skeletal arguments in briefs are waived"). It would be inconsistent with the statutory text, too.

F.3d 853, 857 (7th Cir. 2018) (citation omitted); 14AA Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3702.5 (4th ed. 2020) ("[A]ttorney fees are includible in computing the jurisdictional amount if the plaintiff may recover them as an element of damages as a matter of right . . . ."). What matters is the amount of legal fees incurred as of the moment of removal. *See Gardynski-Leschuck v. Ford Motor Co.*, 142 F.3d 955, 959 (7th Cir. 1998) ("[L]egal expenses that lie in the future and can be avoided by the defendant's prompt satisfaction of the plaintiff's demand are not an amount 'in controversy' when the suit is filed."); *ABM Sec. Servs., Inc. v. Davis*, 646 F.3d 475, 479 (7th Cir. 2011) ("[O]nly attorneys' fees incurred up to the time of removal could be included in the amount in controversy."). Future fees don't count.

From day one, Domingo sought attorneys' fees under the Illinois Insurance Code for Prudential's vexatious and unreasonable denial of coverage. *See* Cplt., at ¶ 57 (Dckt. No. 4); 215 ILCS 5/155. Domingo estimates that the attorneys' fees at the time of removal totaled $25,000. *See* Mtn. to Remand, at 11 (Dckt. No. 48).

Prudential argues that Domingo's $25,000 estimate is a "post-removal reduction" in the attorneys' fee estimate. *See* Def.'s Opp. to Mtn. to Remand, at 10 (Dckt. No. 62). Not quite. The state court complaint requested attorneys' fees, but did not pin down a number. But the figure is a little lower than Domingo originally claimed. In the Initial Status Report, Domingo estimated that she had incurred $28,882 in attorneys' fees through the filing of the complaint.[9] *See* Initial Status Report for Reassigned Case, at 2 (Dckt. No. 32).

---

[9] The relevant date is the date of removal, not the date when Domingo filed the state court complaint. Still, there is no basis in the record that Domingo incurred any meaningful legal fees between those dates. Plaintiff contends that counsel had only one call during that period, so at most, the amount would increase by a "couple hundred dollars." *See* Mtn. to Remand, at 11 (Dckt. No. 48).

Domingo does not explain how the $28,882 figure (which is precise, suggesting an actual calculation) fell to an estimate of $25,000. So, for the sake of argument, the Court will use the higher figure. Domingo's demand for attorneys' fees added $28,882 to the amount in controversy.

### D. The Amount in Controversy

Putting the pieces together, the amount in controversy at the time of removal was less than $75,000. At the time of removal, Domingo had a claim for $15,191.40 in disability benefits under the policy – anything more was legally impossible. Statutory damages maxed out at $9,114.84. And attorneys' fees totaled $28,882.

Added together, the amount in controversy was only $53,188.24. Domingo missed the $75,000 threshold by more than $20,000.

### Conclusion

For the reasons stated above, the Court grants Plaintiff's motion to remand. This case is remanded to the Circuit Court of Cook County. The Court declines to award costs and attorneys' fees. *See* 28 U.S.C. § 1447(c).

Date: November 6, 2020

_____
Steven C. Seeger
United States District Judge